Shedrick L. KING, Plaintiff–Appellant,

v.

Weldon COOKE, Robert Doster, Charles Bloomer, Tim Todd, and Various Unknown Physicians and Surgeons, Wishard Memorial Hospital, Defendants–Appellees.

No. 93–2649.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided June 10, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Aug. 15, 1994.

Hamid Kashani (argued), Gloria K. Grinnan, Indianapolis, IN, for plaintiff-appellant.

Wayne E. Uhl, Deputy Atty. Gen. (argued), Matthew C. Robinson, Office of the Atty. Gen., Gen. Litigation, Indianapolis, IN, for defendants-appellees.

Before BAUER and CUDAHY, Circuit Judges, and MORAN, District Judge.*

CUDAHY, Circuit Judge.

During a riot at the Indiana State Prison in Michigan City, Indiana on April 21–22, 1986, emergency squad guards used "artillery simulation devices" to subdue prisoners. Inmate Shedrick King, who was locked in his cell the entire time and did not participate in the uprising, claimed his eyes were injured from the gas used by the prison guards. A lockdown went into effect after the uprising and King was not permitted to see a doctor for nearly a month despite repeated requests. His right eye was subsequently removed and vision in his left eye is impaired.

In 1987, King brought *pro se* claims under 42 U.S.C. § 1983 and state law against the defendant prison doctors (Weldon Cooke and Robert Doster) and prison hospital administrators (Tim Todd and Charles Bloomer), claiming that their deliberate indifference to his medical needs violated the Eighth Amendment.[1] He alleged that although the prison doctors referred him to eye specialists, defendants Bloomer and Todd repeatedly refused to schedule these outside trips. He also alleged that Drs. Cooke and Doster and other unknown doctors ignored his numerous complaints of severe pain, refused to see him despite nearly daily requests for care and eventually misdiagnosed and mistreated his condition. King was also seen several times at the Wishard Memorial Eye Clinic before his eye was removed in June 1987. The defendants claim King's eye infection resulted from a BB gun shot wound inflicted in 1973. The record indicated that King had suffered from eye problems in his right eye

---

* The Hon. James B. Moran, Chief Judge for the Northern District of Illinois, is sitting by designation.

1. The state malpractice claims were subsequently abandoned since King, proceeding for several years without an attorney, defaulted on notice requirements.

for several years although the condition was apparently stabilized in 1985.

Although the defendants initially admitted King's allegations in their answer, several years into the action they amended their answer to deny liability. The district court subsequently granted summary judgment for the defendants. King appeals from both the order granting the defendants leave to amend their answer and the summary judgment for the defendants.

## I.

Given its slipshod performance throughout this litigation, it comes as no surprise that the Indiana Office of the Attorney General received Rule 11 sanctions for filing its answer without carefully reading it. But, despite the state's argument to the contrary, the imposition of sanctions does not resolve King's claim that the amendment came too late and unduly prejudiced his case.[2]

King filed his complaint in September 1987. The court appointed him counsel in February 1988. In September 1988, after twice ignoring filing deadlines, the defendants filed an answer admitting that they were deliberately indifferent to King's medical condition and that this indifference constituted cruel and unusual punishment under the Eighth Amendment.[3] They also admitted the factual basis for King's state claims, but denied liability under state law. But the answer also raised affirmative defenses of qualified immunity and failure to state a claim, and concluded with a prayer for relief that King "take nothing by way of his complaint."

In October 1988, King's attorney, Donald Pagos of Michigan City, petitioned to withdraw from the case, although inexplicably leave was not granted until April 1990. King was incarcerated in Michigan City when Pagos was appointed, but was subsequently transferred to the Indiana Reformatory in Pendleton, Indiana. Pagos petitioned for withdrawal on the basis of his inability to communicate with King after the transfer to Pendleton. Although the district court did not rule on the motion for withdrawal until April 1990, the docket makes clear that King was effectively without representation after October 1988. Throughout 1989, King wrote several letters to Pagos and the district court inquiring about the status of the withdrawal motion and his case, expressing concern that he was unable to meet the discovery deadlines in the original scheduling order.[4] In November 1989, the district court informed King it was seeking new counsel for him. The district court in January 1991 appointed King's present counsel, who promptly commenced discovery.[5]

The defendants filed a motion for summary judgment in December 1991. King responded with a motion for partial judgment on the pleadings pursuant to F.R.C.P. 12(c), on the basis of the defendants' admissions. The defendants, realizing that they had mistakenly admitted the allegations, moved for leave to amend their answer to deny liability. The district court referred the matter to a magistrate judge, who found that the admissions were merely a word processing error and that the defendants had otherwise indicated that they denied liability—through their affirmative defenses, prayer for relief and a status report filed before their answer indicating that they denied the allegations. The

2. The Deputy Attorney General began his oral argument with the claim that "the focus of what happened here is a Rule 11 violation ... to some extent there has been compensation here for the harm that was caused by the core violation here."

3. On October 7, 1987, the defendants moved for an extension of time to file their answer. On November 9, 1987 they filed a motion to dismiss, which was denied on May 31, 1988. The defendants failed to file an answer by the June 10, 1988 deadline. On June 17, 1988 they moved for another extension of time, and were granted leave to file until July 16, 1988. The defendants

missed this deadline too, filing their answer on September 1, 1988.

4. For example, the letter of November 13, 1989 read in part, "I don't even know if I have counsel ... I just don't want to get into court and find out that there is something I didn't do."

5. On April 8, 1991, King's counsel served the defendants with six interrogatories and 12 requests for production of documents. The defendants responded on December 9, 1991. The defendants conducted no discovery of their own.

magistrate judge also found that King would not be prejudiced by the amendment since he had not relied on the admissions. The district court adopted the magistrate's report and allowed the amendment. King moved for reconsideration after our decision in *Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348 (7th Cir.1992), but this motion was denied.

King argues that the district court abused its discretion by granting defendants leave to change their admissions to denials. *Cf. Daugherity*, 970 F.2d at 351 (decision to grant or deny amendment within discretion of district court). Under F.R.C.P. 15(a), courts should freely allow pleading amendments "in the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 330, 9 L.Ed.2d 222 (1962); *Villa v. City of Chicago*, 924 F.2d 629, 632 (7th Cir.1991). King does not allege bad faith or dilatory motive; rather he contends that defendants unduly delayed filing their amendment and that he would suffer severe prejudice from the amendment.

The defendants filed their motion to amend more than three years after filing the answer. Apparently they had not noticed their error until King pointed it out in his motion for judgment on the pleadings (hence the Rule 11 sanctions). The defendants argue that they did not "delay" since they promptly moved to amend upon discovering the error. But the state should not be permitted to invoke some sort of discovery rule triggered by the simple act of reading its own pleadings. We hold the state responsible for the three year delay. But delay alone will not generally justify denying a motion to amend a pleading absent a showing of prejudice from the delay. *Tragarz v. Keene Corp.*, 980 F.2d 411, 432 (7th Cir.1992); *Textor v. Board of Regents*, 711 F.2d 1387, 1391 (7th Cir.1983). However, "the longer the delay, the greater the presumption against granting leave to amend ... when extreme, 'delay

itself may be considered prejudicial,' " *Tamari v. Bache & Co.*, 838 F.2d 904, 908 (7th Cir.1988), *quoting Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 139 (1st Cir.1985).

King argues that he is prejudiced by the three year delay because important evidence has gone stale and he is now unable to locate witnesses. The defendants' responses to King's discovery requests bear out King's claim. In an attempt to locate witnesses to the alleged actions of the guards on April 22, 1986, and King's subsequent requests for medical attention, King requested the names and whereabouts of prison staff, infirmary employees and inmates of Cellhouse C (where King was imprisoned and the uprising occurred). The defendants responded that "No one can be found at this time who has any personal knowledge of the injuries." In response to the request for the whereabouts of infirmary employees, the defendants listed 52 names, of whom the whereabouts of 29 were unknown. The defendants declined to provide a list of inmates who were incarcerated in Cellhouse C in 1986–87, claiming this would require looking through 10,000 individual files. King argues that, at this late date, it would be nearly impossible for him to locate witnesses through any other means, but that, in any event, their memories of the 1986 events have probably faded.

Disturbingly, King also alleges that crucial prison logbooks and documents no longer exist (although he explicitly does not allege that the defendants themselves destroyed the documents). King requested from the defendants all log books used by officers of Cellhouse C in 1986, and logs of inmate telephone calls, sick calls and sick passes, obviously to establish the number of times he requested medical assistance. The defendants responded that the information was available for inspection upon request. But when King's counsel went to the Indiana State Prison in April 1992 to inspect the documents, he claims he was told that these documents no longer existed, although similar documents existed for the dates before and after the requested time period. King also produced a Department of Corrections directive dated just prior to the April 1986

uprising indicating that no records at the Indiana State Prison should be destroyed.

Fulfilling the fears expressed in King's letters from prison throughout 1989, the passage of time has no doubt prejudiced King's ability to prove his case. Delays in the amendment of pleadings that result in the loss of evidence or of a witness will indeed often be prejudicial. *See Isaac v. Harvard Univ.*, 769 F.2d 817 (1st Cir.1985); *Fuller v. Marx*, 724 F.2d 717 (8th Cir.1984); *Boris v. Moore*, 253 F.2d 523 (7th Cir.1958); 6 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1488 & n. 22 (1990). But the prejudice to King stems not from the erroneous answer and subsequent amendment, but rather from the lack of discovery for two and a half years after the answer was filed. This, of course, is attributable to the absence of counsel rather than to any intentional delay by King. King's evidentiary troubles were apparent by December 1991, when the defendants filed their responses to his discovery requests; the motion to amend in January 1992 did not make discovery more difficult. Moreover, we agree that the district court did not abuse its discretion when it found that King was not prejudiced by the amendment since he had not relied upon the earlier answer. There is no evidence in the record that either King or his first attorney noticed that the defendants had admitted liability. King's present lawyer was appointed in early 1991 and did not discover the defendants' answer until February or March of 1991. Thus we cannot conclude that King or his attorneys had foregone discovery in reliance on the defendants' admissions.

King argues that the district court erroneously placed the burden of proof on him to show that he was not prejudiced by the amendment, rather than requiring the defendants to show the absence of prejudice. We agree that a party seeking an amendment carries the burden of proof in showing that no prejudice will result to the non-moving party. *Daugherity*, 970 F.2d at 353. But it does not appear that the district court improperly shifted the burden in this case. All of the evidence points away from the conclusion that King could have reasonably relied on the defendants' admissions in foregoing discovery until 1991: King's present counsel did not come on board until 1991; before filing an answer the defendants maintained that they contested all of the allegations; and the answer's prayer for relief and affirmative defenses were inconsistent with an admission of liability.

In his motion for reconsideration, King argued that the amendment should be denied in light of our decision in *Daugherity*. In *Daugherity*, we found that a district court abused its discretion by allowing a defendant to amend his answer three and a half years into a case. 970 F.2d at 353. There was no finding of bad faith or intentional delay; the defendants claimed that they had simply overlooked the possible amendment while the litigation sat on the shelf for several years. *Id.* This court reversed, finding that the delayed amendment was prejudicial. But the amendment there sought to add an affirmative defense of a failure to exhaust administrative remedies. The timely assertion of this defense is particularly crucial, as with the pleading of a statute of limitations, *see Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1155 (2d Cir.1968); prejudice then flows directly from the tardy amendment. But the difficulties King faced after the defendants formally contested liability could not be attributed to the amendment, but only to the (however understandably) delayed discovery and litigation.

We therefore cannot conclude that the district court abused its discretion when it granted the motion to amend. Perhaps a prisoner who filed a complaint as off-course as the answer here would not have been indulged nearly so long as the state has been in this case. Moreover, we are deeply disturbed that the management of this case has produced several dead-ends, through no fault of King. But we cannot, after finding that the admissions were inadvertent and that the amendment was not prejudicial, hearken back to the formalist days of common-law pleading and reject defendants' attempts to correct their mistake.

## II.

King also appeals the district court's grant of the defendants' motion for summary

judgment as to defendant doctors Cooke and Doster. Unfortunately, we must recite the chronology of the summary judgment motion since it is relevant to King's argument. On December 30, 1991, the defendants moved for summary judgment, alleging that King had received sufficient treatment for his eye problems. King responded in January 1992, alleging that there remained disputed issues of material fact. King then filed his motion for judgment on the pleadings. After allowing the defendants to amend their answer, the district court granted King leave to file a supplemental response to the motion for summary judgment.

King moved four times for deadline extensions in order to conduct discovery, with a final deadline on November 25, 1992. King failed to file a supplemental response on time. However, on December 2, 1992, he filed a motion explaining his failure to file by November 25, along with a motion for reconsideration of the ruling granting defendant's motion to amend. In the same motion, he requested an extension for filing his supplemental response until one week after the court's ruling on the motion for reconsideration. The district court denied the motion for reconsideration in a memorandum opinion on January 12, 1993, but did not rule on King's motion for an extension on the summary judgment response. Simultaneously, the defendants requested additional time to file a supplemental motion for summary judgment addressing recent discovery. The defendants were first granted until February 12, 1993 to supplement their motion for summary judgment, followed by an extension to March 12. March 12 came and went, and the neither the defendants nor King had filed their motions. On April 8, 1993, the defendants requested another extension. Before ruling on their request, the court noted that "with all extensions having expired, the court assumes the summary judgment motion is ripe for ruling," and granted defendants' motion for summary judgment.

On appeal, King argues that the district court jumped the gun by granting defendants' summary judgment before King had filed his supplemental response. King argues that the defendants were required to file a supplemental motion for summary judgment, and that he was waiting for their motion before filing a response. Even though the defendants missed their deadline of March 12, on April 8 they requested (but were denied) additional time. King did not expect the court to deny the defendants' request for an extension or to rule on the motion, since the defendants had routinely missed deadlines with impunity.

But we cannot conclude that the district court abused its discretion by deciding the motion for summary judgment on April 8, 1993. The motions had been briefed by January 1992; neither party met its deadline for filing supplemental motions. It is understandable that King waited to receive defendant's supplemental motion, since their motion would have addressed new discovery issues. But the district court had never indicated that King should wait for the defendant's motion before filing a response; rather, the district court set independent deadlines for King's motion. Technically, the latest deadline was November 25, 1992, since the district court had never ruled on King's motion to extend the deadline (although even the requested extension would have run only until January 19, a week after the court decided the motion to reconsider the pleading amendment). Perhaps it was a departure for the district court to decide a motion after a lapse no longer than had previously occurred in this case, and when the motions addressing a year's worth of discovery had yet to be filed. But sticking to the letter of deadlines, we cannot say that the district court abused its discretion by ruling on the summary judgment motion a month after the last deadline had passed.

In his Rule 59 motion for reconsideration, King argued that the summary judgment should be vacated since he had not abandoned the case, but rather had encountered difficulties obtaining discovery from the defendants. He also identified numerous material facts he believed were still in dispute, and attached voluminous exhibits. The district court concluded that King should have sought a continuance under Rule 56(f) to

permit further discovery.[6] Rule 56(f) is intended as a safeguard against a premature grant of summary judgment such as King complains of here; thus we should construe the rule liberally and not find violations on rigid technical grounds. *See, e.g., Wichita Falls Office Assoc. v. Banc One Corp.,* 978 F.2d 915, 918 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2340, 124 L.Ed.2d 251 (1993); 10A Wright, Miller & Kane, Federal Practice and Procedure § 2740. But we have also held that when a party does not avail himself of relief under Rule 56(f), it is generally not an abuse of discretion for the district court to rule on the motion for summary judgment. *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.,* 826 F.2d 725, 727 (7th Cir.1987). Thus the district court was correct that King's first resort should have been to Rule 56(f) rather than to Rule 59.

The district court also found that all of the exhibits (save an expert's affidavit indicating that King had not received adequate care) that King presented in his Rule 59 motion were dated before 1993, and could have been brought to the court's attention before the April 8, 1993 ruling. Thus the district court denied reconsideration since King had not shown that he could not have produced this evidence or moved for a continuance under Rule 56(f) any sooner.

■■■ The district court correctly ruled that King could not use a Rule 59 motion to present new theories, request additional discovery time or submit previously available evidence. *See Figgie Int'l v. Miller,* 966 F.2d 1178, 1180 (7th Cir.1992); *Publishers Resource v. Walker–Davis Publications,* 762 F.2d 557, 561 (7th Cir.1985). But a Rule 59 motion is also available to correct "clear errors of law or fact." *Publishers Resource,*

762 F.2d at 561. King's Rule 59 motion alleges such errors, specifically that the district court granted summary judgment despite evidence in the record of genuine issues of material fact. Prior to the riot in 1986, King had been treated for glaucoma in his right eye. Focusing on the general course of King's treatment from 1985 through 1987, the district court concluded that he had received adequate treatment. But King's complaint centered on the specific treatment he received after the riot of April 22, 1986, when he alleges that the prison doctors deliberately refused to see him despite nearly daily requests for medical assistance. The record contained King's detailed affidavit describing his requests for attention, which, of course, King attempted to corroborate through discovery.[7] In his Rule 59 motion, King identified numerous disputed issues of fact. Since a motion for summary judgment should not be granted unless it is clear that no material issue of fact exists, *Chambers v. American Trans Air,* 17 F.3d 998, 1002 (7th Cir.1994), it would appear that King's Rule 59 motion may have alleged an adequate basis for reconsideration of the district court's grant of summary judgment.

But on appeal King does not challenge the district court's grant of summary judgment or denial of the Rule 59 motion on substantive grounds. He argues not that the court ruled incorrectly, but only that it ruled too quickly—because King had not filed a response and sought more discovery. We must therefore conclude that King has waived an argument on the merits. Since we do not find that the district court abused its discretion by ruling on the summary judgment motion on April 8, 1993 or refusing to reopen the case to continue discovery, we cannot disturb the district court's grant of summary

6. F.R.C.P. 56(f) provides:
   Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

7. King's affidavit, dated November 30, 1992, was submitted as part of King's Reply Memorandum of Law in support of Motion to Reconsider the Court's Ruling of April 10, 1992, filed December 28, 1992. It was thus part of the record when the district court ruled on the summary judgment motion on April 8, 1993.

judgment. The orders of the district court are AFFIRMED.